UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALLCO FINANCE LIMITED,<br>        *Plaintiff,*<br>        *v.*<br>ROBERT KLEE, *in his Official Capacity as*<br>*Commissioner of the Connecticut Department of*<br>*Energy and Environmental Protection,*<br>        *Defendant.* | Civil No. 3:13cv1874 (JBA)<br><br><br>December 10, 2014 |

Defendant Robert Klee, in his official capacity as the Commissioner of the Connecticut Department of Energy and Environmental Protection (the "Commissioner" and "DEEP" respectively) moves [Doc. # 31] to dismiss Plaintiff Allco Finance Limited's ("Allco") First Amended Complaint [Doc. # 25] for lack of standing and failure to state a claim. For the reasons that follow, Defendant's motion is granted.

I.      **Facts Alleged**

In 2013, Connecticut enacted Connecticut Public Act 13-303, Section 6 ("Section 6"), which empowers the Commissioner to solicit proposals for renewable energy and compel the Connecticut Power and Light Company and United Illuminating (the "Connecticut Utilities") to enter into wholesale power purchase agreements for a term of up to 20 years serving up to 4% of Connecticut's electricity needs.  (Am. Compl. ¶ 5.)

Section 6 of Public Act 13-303 states, in pertinent part:

On or after January 1, 2013, the commissioner . . . may . . . solicit proposals . . . from providers of Class I renewable energy sources . . . if the commissioner finds such proposals to be in the interest of ratepayers . . . [he or she] may select proposals from such resources to meet up to four per cent of the load distributed by the state's electric distribution companies. The commissioner may direct the electric distribution companies to enter into power purchase agreements for energy, capacity

and environmental attributes, or any combination thereof, for periods of not more than twenty years. . . .

In July 2013, the Commissioner solicited proposals for renewable energy resources pursuant to Section 6.  (Am. Compl. ¶ 9; Notice of Request for Proposals, Ex. A to Am. Compl.)  Allco submitted proposals for five solar projects, but the Commissioner selected two other projects, a 250 megawatt wind project located in Maine (the "Number Nine Wind Project") and a 20 megawatt solar project located in Connecticut (the "Fusion Solar Project") and "ordered the Connecticut Utilities to execute [power purchase agreements] at fixed wholesale prices" with them.  (*Id.* ¶ 13; *see also* Commissioner's Order, Ex. B to Am. Compl.; Commissioner's Determination, Ex. C to Am. Compl.)

Allco alleges that the Commissioner violated federal law by doing so, because under the Federal Power Act of 1935 ("FPA"), Congress gave the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over all wholesale electricity rates, charges, and terms.  (Am. Comp. ¶ 7.)  The only exception "to the blanket rule prohibiting states from engaging in any type of regulation or setting the wholesale price for energy" (*id.* ¶ 8) is under the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a-3, ("PURPA"), which allows states to fix the price of energy under a power purchase agreement if (1) the facility is a "small power production facility," which is defined as no greater than 80 megawatts in size and (2) the rate fixed in the power purchase agreement equals the facilities "avoided costs" (Am. Comp. ¶¶ 11, 24).

Thus Allco alleges that in his implementation of Section 6, Defendant has "fixed" wholesale energy prices, which would only be permissible under the FPA if the proposals were in compliance with PURPA, such as Allco's five projects, which were all for 80

megawatts or smaller, and the price for "one or more of the Plaintiff's projects equaled the Connecticut Utilities avoided costs." (*Id.* ¶¶ 45–46, 50, 53.)   Allco does not allege that Section 6 is facially invalid and when it submitted its proposals, "Allco had every reason to believe that the Commissioner would observe the two clear federal requirements that restrict his authority to act under Section 6 in the process of evaluating and selecting projects."[1] (*Id.* ¶ 10.)

## II.   Discussion

### A.      Regulation of the Wholesale Energy Market

"For much of the 20th century, the energy market was dominated by vertically integrated firms that produced, transmitted, and delivered power to end-use customers," *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 471 (4th Cir. 2014), and "the States possessed broad authority to regulate public utilities, but this power was limited by . . . the negative impact of the Commerce Clause prohibit[ing] state regulation that directly burdens interstate commerce," *New York v. F.E.R.C.*, 535 U.S. 1, 5 (2002).

This limitation on state authority was first recognized in *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927), where the Supreme Court invalidated an attempt by Rhode Island to regulate the rates charged by a Rhode Island

---

[1] Plaintiff asserts a violation of the Federal Power Act and that Defendant's implementation of Section 6 is preempted under the Supremacy Clause and seeks a declaratory judgment and injunctive relief, declaring that the power purchase agreement for the Number Nine Wind Project void *ab initio* and enjoining "the Commissioner from enforcing or otherwise putting into effect any part of the Order and . . .from issuing further orders and decisions that are inconsistent with the FPA and PURPA" (Count One).  Plaintiff also claims that Defendant "impermissibly discriminated" against its bid in violation of 42 U.S.C. § 1983 (Count Two).

plant selling electricity to a Massachusetts company, which resold the electricity to the city of Attleboro, Massachusetts, because it imposed a "direct burden upon interstate commerce." Creating what has become known as the "*Attleboro* gap," the Supreme Court held that this interstate transaction was not subject to regulation by either Rhode Island or Massachusetts, but only "by the exercise of the power vested in Congress." *Id.* at 90.

Congress responded with the FPA, which "was designed in part to fill the regulatory gap created by the dormant Commerce Clause and cover the then-nascent field of interstate electricity sales," *Nazarian*, 753 F.3d at 472, "but it also extended federal coverage to some areas that previously had been state regulated," *New York*, 535 U.S. at 6 (footnote omitted). The FPA charged FERC, "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Id.* (quoting *Gulf States Util. Co. v. FPC,* 411 U.S. 747, 758 (1973)).

Jurisdiction over the sale and delivery of electricity is split between the federal government and the states on the basis of the type of service being provided and the nature of the energy sale. *Niagara Mohawk Power Corp. v. F.E.R.C.*, 452 F.3d 822, 824 (D.C. Cir. 2006). Specifically, in § 201(b) of the FPA, Congress recognized FERC's jurisdiction as including "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). "FERC's authority includes 'exclusive jurisdiction over the rates to be charged [a utility's] interstate wholesale customers.'" *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 432 (2d Cir. 2013) (quoting *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966 (1986)) (alterations in original). Furthermore, § 205 of the FPA prohibited, among other things, unreasonable rates and undue discrimination "with respect to any

4

transmission or sale subject to the jurisdiction of the Commission," 16 U.S.C. §§ 824d(a)–(b), and § 206 authorized FERC to correct unlawful practices and gave it jurisdiction over "any rule, regulation, practice, or contract affecting" such rates and charges, *id.* § 824e(a).

But the FPA states that "except as specifically provided in this subchapter and subchapter III of this chapter," FERC has no jurisdiction "over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." *Id.* § 824(b)(1). Consequently, "[s]tates retain jurisdiction over retail sales of electricity and over local distribution facilities" and while "transmission occurs pursuant to FERC-approved tariffs[,] local distribution occurs under rates set by a state's public service commission." *Niagara Mohawk Power Corp.*, 452 F.3d at 824.

Overall, interstate energy "markets are the product of a finely-wrought scheme that attempts to achieve a variety of different aims. FERC rules encourage the construction of new plants and sustain existing ones. They seek to preclude state distortion of wholesale prices while preserving general state authority over generation sources.  They satisfy short-term demand and ensure sufficient long-term supply. In short, the federal scheme is carefully calibrated to protect a host of competing interests.  It represents a comprehensive program of regulation that is quite sensitive to external tampering." *Nazarian*, 753 F.3d at 473.

5

B.      Standing[2]

Defendant and Intervenor Number Nine Wind Farm LLC ("Number Nine") both contend that because "Allco's claim of injury depends on legal rights allegedly conferred by statute, that statute and the rights that it conveys guides the determination of standing" and they look to Connecticut law on the standing for disappointed bidders challenging the award of a state contract.  (Number Nine's Mem. Supp. [Doc. # 39] at 4–5; Def.'s Mem. Supp. [Doc. # 31-1] at 9–10.)  However, Allco does not allege a violation of Section 6 or the Connecticut competitive bidding statute under which a "disappointed bidder" has standing "where fraud, corruption or acts undermining the objective and integrity of the bidding process." *Ardmare Const. Co. v. Freedman*, 191 Conn. 497, 504–05 (1983).  Rather, as Allco clarified at oral argument, its claim is that Section 6 as applied is a violation of the FPA and PURPA, which preempt Section 6 by operation of the Supremacy Clause.  (Oral Argument Tr. [Doc. # 53] at 10, 17–18.)  Thus, Allco alleges a violation of federal law and the Court must look there to evaluate Plaintiff's standing.

"[T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical.'  Second, there must be a causal connection between the

---

[2] "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*  In resolving a motion to dismiss for lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings.  *Id.*

injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'  Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations, alterations and footnotes omitted).

 "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Allco maintains that "as a small power producer and participant in energy markets [it] has a legally protected interest to be free from unlawful actions of State officials related to those markets" (Pl.'s Opp'n [Doc. # 34] at 12) and that it has suffered particularized injuries in fact to that legally protected interest because: (1) it incurred costs in developing its five bids; (2) "one or more of the Plaintiff's projects would have been selected if the Number Nine wind project was not;" and (3) it "has made investment and development decisions in reliance on the market signals sent by the federally regulated interstate capacity market" and Defendant has "interfere[d] with those market forces and rights by seeking to foster uneconomic entry into the market, contrary to the

Plaintiff's investment expectations based upon the Congressionally mandated framework of the FPA and PURPA." (*Id.* at 12.)

Even assuming that the expense that Allco incurred in connection with its bid constitutes an injury in fact, "[t]he interest [it] asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that [it] says was violated," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153 (1970)), here the FPA and PURPA. For example, in *Gosnell v. Fed. Deposit Ins. Corp.*, 938 F.2d 372, 375 (2d Cir. 1991), the plaintiff was a "disappointed bidder" for an art collection that was acquired by the Federal Deposit Insurance Corporation ("FDIC") from a failed bank and alleged that the FDIC exceeded its statutory authority by agreeing to sell the collection to a museum at its appraised value rather than making the collection available on the open market and thereby "failed to administer its affairs fairly and impartially" in violation of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). *Id.* at 373.

The Second Circuit held that even assuming that the plaintiff could demonstrate that he suffered an injury by not winning the bid, "there is no way that he could ever" show that he was within the zone of interest protected by FIRREA, because allowing him "to sue based on his status as a disappointed bidder would be inconsistent with FIRREA's goal of giving the FDIC broad discretion in disposing of the assets under its control" and the standing doctrine "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress intended to permit the suit." *Id.* at 375–76 (internal quotation marks omitted).

The Second Circuit contrasted the statute authorizing the FDIC's actions to defense procurement laws, which grant a disappointed bidder standing because "the statutes alleged to have been violated were quite 'specific in their reference to bidders'" and "contained specific procedural guidelines protecting the bidders' rights."[3] *Id.* at 376 (quoting *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 719 (2d Cir. 1983). Although Allco contends that "Congress has laid down specific rules in the FPA" regarding "what states can and cannot do" and that it "is an intended beneficiary of those rules," it cites no provision of the complex regulatory scheme that evinces a concern for bidders' rights. (Pl.'s Opp'n at 16.)   Rather, as discussed *supra*, Congress had quite another purpose in mind with the enactment of the FPA, which was "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *New York*, 535 U.S. at 6 (quoting *Gulf States Util. Co. v. FPC,* 411 U.S. 747, 758 (1973)).

Allco cites no cases in which a court has found that a disappointed bidder has standing to raise a preemption challenge to a state program.  Where courts have allowed entities to raise such challenges, they have demonstrated "concrete and particularized

---

[3] Likewise, in the Equal Protection Clause context a disappointed bidder is recognized as having standing even without "alleg[ing] that he would have obtained the benefit but for the barrier" because the "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."   *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

injuries," such as in *PPL Energyplus, LLC v. Solomon*, CIV.A. 11-745, 2011 WL 5007972, at *3 (D.N.J. Oct. 20, 2011), where existing electricity generators and utilities alleged that "by artificially depressing wholesale prices for capacity and energy," a state law would "cost [them] millions of dollars."  By contrast, here Allco has suffered no such injury and despite not being awarded this particular contract remains free to sell whatever energy it wishes in the open market, underscoring the reality that the true injury alleged is the denial of the contract.

Additionally, Allco has failed to satisfy the third requirement for standing—that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defenders of Wildlife*, 504 U.S. at 560–61.  Allco contends that because one of its projects was ranked fourth out of forty-seven bids submitted, these rankings confirm that "it is not only likely, but a near certainty," that if the Number Nine Project had not been selected, "one or more of Plaintiff's projects would have been selected." (Pl.'s Opp'n at 12.)  However, nothing in the statute mandates that projects be selected based upon their ranking.  Instead, the proposals were ranked "[b]ased on [an] analysis of price and non-price factors"[4] and then provided to the Commissioner to determine if they were "'in the interest of ratepayers. . . and in accordance with the policy goals outlined in the'" statute.  (Commissioner's Determination at 10 quoting Section 6.) Although the Commissioner selected the six highest-ranked projects to proceed with contract negotiations with the Connecticut Utilities, only the first- and third-ranked

---

[4] For example, the Commissioner considered project size, evidence of site control, the developer's experience in the New England organized power market, the project's likelihood of meeting the proposed commercial operation date, and contribution to reliability in six specific ways.  (Commissioner's Determination at 4–6, 8–9.)

projects were selected and the second-ranked project was not.  (*See id.* at App'x 2.)  Thus, given the Commissioner's discretion to select projects, it does not necessarily follow that if Number Nine were not selected, Allco's projects would have been.

More fundamentally, however, Section 6 did not mandate that Defendant take any action at all but rather provided that the Commissioner "may" select renewable energy bids if it was determined "to be in the interest of ratepayers."  P.A. 13-303, Section 6. Allco contends that if it "receives a favorable decision in this case, it is likely, if not a virtual certainty that Defendant would make a redetermination . . . that comports with federal law, in which case, based upon the Rankings, it is likely that one or more of Plaintiff's projects would be selected" and that "[i]n light of the stated goals of the Connecticut Legislature, the Governor, and the Defendant, it is a remote possibility that the Defendant would do nothing if a decision in Plaintiff's favor were issued in this case." (Pl.'s Opp'n at 14.)  But Allco provides no support for its prediction and, as Defendant notes, the Commissioner could not simply make a redetermination based on the original rankings cited by Allco, because bidders were only required to keep their bids open for six months and the bids have now expired.  (Oral Argument Tr. at 34.)

Thus, if the Court were to void the results of the Section 6 procurement, Defendant explains that "the state might very well take no further action because P.A. 13-303 is predicated upon a policy of letting the market, not the state, set prices" and even if the state decided to try again, P.A. 13-303 is the Commissioner's only authority "to act with regard to long-term renewable energy contracts" and "a favorable decision for Plaintiff in this case would avail the Plaintiff nothing that it does not already have, i.e., the opportunity to participate in a future procurement, if any."  (Def.'s Reply [Doc. # 40] at

3–4.)  Because it is speculative at best whether Allco's claimed injury would be redressed by a favorable decision, the Court concludes that it lacks standing.  *See Defenders of Wildlife*, 504 U.S. at 560–61.  Although the Court has determined that Plaintiff lacks standing, it also concludes that Plaintiff's claim fails on the merits.

### C.    Failure to State a Claim[5]

#### 1.    *Preemption Principles*

Preemption can take several forms, but Allco advances only a field preemption argument (Oral Argument Tr. at 32) whereby "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).  "Congress' intent to supersede state law may be found from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *Entergy Nuclear Vermont Yankee, LLC*, 733 F.3d at 409 (quoting *Suffolk Cnty. v. Long Island Lighting Co.*, 728 F.2d 52, 57 (2d Cir. 1984)) (alterations in original), and "federal law occupies [the] entire field of regulation," *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005).

---

[5] To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  Detailed allegations are not required but a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (alterations in original).

Where field preemption is claimed in "areas that have 'been traditionally occupied by the States,' congressional intent to supersede state laws must be 'clear and manifest.'" *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525 (1977)).  "In determining whether preemption exists, we must 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"  *Entergy Nuclear Vermont Yankee, LLC*, 733 F.3d at 408 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

2.     *Section 6*

Plaintiff contends that the Commissioner's selection of bids pursuant to Section 6 is unconstitutional based on field preemption, because it is an unlawful "attempt by a State to compel distributors to purchase energy from generation facilities at a particular price."  (Pl.'s Opp'n at 19.)  Allco does not dispute that "states have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction" and "may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation."  *Entergy Nuclear Vermont Yankee, LLC*, 733 F.3d at 417 (quoting *S. Cal. Edison Co. San Diego Gas & Elec. Co.,* 71 FERC ¶ 61,269, at *8 (June 2, 1995) (alterations in original)); (Pl.'s Opp'n at 7–8).  But Plaintiff maintains that FERC has exclusive jurisdiction over "wholesale energy and capacity markets and the 'practices' or 'contracts' that affect them" and that Defendant's order under Section 6 "intrudes on FERC's exclusive jurisdiction because it fixes a long-term wholesale energy price and guarantees that State-selected generators will receive that price for their sales of energy for resale" by requiring the Connecticut Utilities "to enter into long-term

13

wholesale purchase contracts with generators chosen by the Defendant" and "[e]ach contract fixes a wholesale energy price."  (Pl.'s Opp'n at 8, 34.)

As discussed above, Allco is correct that a "wealth of case law confirms FERC's exclusive power to regulate wholesale sales of energy in interstate commerce, including the justness and reasonableness of the rates charged."  *Nazarian*, 753 F.3d at 475.  In this area, "if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject." *Miss. Power & Light Co. v. Mississippi ex rel. Moore,* 487 U.S. 354, 377 (1988) (Scalia, J., concurring).  However, despite correctly identifying the legal standards applicable to the division of state and federal authority in the energy markets, the flaw in Allco's argument is that it repeatedly contends without support that Defendant has "fixed" wholesale energy prices when this characterization is contradicted by documents attached to the Amended Complaint.[6]

As Defendant notes, Section 6 authorized him to "solicit proposals" and then provided that he "may select proposals" and "may direct the electric distribution companies to enter into power purchase agreements."  P.A. 13-303, Section 6.  Defendant and Number Nine maintain that Section 6 "expressly permitted generators to offer whatever price they wished" and that Defendant has not "fixed the price" of the selected

---

[6] The Court can consider documents attached to the complaint on a motion to dismiss under Rule 12(b)(6), *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal quotation marks omitted)); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."), and when "considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 664.

projects.[7]  (Def.'s Mem. Supp. at 17.)  Number Nine contends that it "and presumably other bidders, deliberated internally to determine a bid price that would be viable and competitive.  Then, DEEP undertook a process of evaluating bids considering a variety of price and non-price elements, consistent with the traditional authority of states to direct how jurisdictional utilities obtain generation."  (Number Nine's Mem. Supp. at 16.)

The power purchase agreements were "signed at the price freely offered by [Number Nine and Fusion Solar] and accepted by the [Connecticut Utilities] and the Commissioner had no ability to change that price."  (Def.'s Mem. Supp. at 20.)  Rather than "interfering with FERC's control of the interstate market . . . . the Commissioner was asking the market to offer prices which might, or might not be accepted by buyers," which "is a clear example of a permissible action under the FPA as implemented by FERC."  (*Id*.; *see also* Number Nine's Mem. Supp. at 15–17.)  Number Nine notes that the power purchase agreements explicitly require that it apply for market-based rates from FERC, who will "determine whether Number Nine may permissibly make sales to the [Connecticut Utilities] at the negotiated rates set in the" power purchase agreements based on "whether or not Number Nine possesses market power," which would require it "to mitigate that market power or lose the benefit of the DEEP procurement."

---

[7] Defendant maintains that the procurement was not conducted pursuant to PURPA under which he would be entitled to "fix" energy prices for a "small power production facility," which is no greater than 80 megawatts in size, and there is no dispute that the Number Nine Project would not qualify under PURPA because it is larger than 80 megawatts.  (Def.'s Mem. Supp. at 14; Number Nine's Mem. Supp. at 5 n.1.)  At oral argument, Plaintiff clarified that it was not seeking to invalidate the Fusion Solar contract, because it is a PURPA generator.  (Oral Argument Tr. at 26.)

Consequently, Number Nine maintains, "[f]ar from subverting the federal regulatory regime, Number Nine will comply with it." (Number Nine's Mem. Supp. at 17.)

Defendant's argument is consistent with how Section 6 was implemented. DEEP's Request for Proposals stated that a "proposal must provide fixed prices (in $/MWh) annually for the term of the contract" and nowhere did it indicate that the Commissioner would set or mandate any particular price. (Request for Proposals § 2.2.12(a).) Proposals were to be evaluated on the basis of a number of price and non-price evaluation criteria (*see id.* § 2.3) and DEEP was to "notify Applicants whether they have been selected to finalize a" power purchase agreement with the Connecticut Utilities (*id.* § 2.4). Applicants could then decide whether "they intend to proceed with their proposals" and if so, would "enter into separate [agreements] with each [Connecticut Utility]" and DEEP could "coordinate the finalization of [the agreements] between the Applicants and the [Connecticut Utilities], where changes to the form [agreements] are necessary to conform to the contracting practices of each" Connecticut Utility. (*Id.*)

The Commissioner's Determination of how he selected the winning bids confirms that he "analyzed proposals received" and on August 20, 2013, "selected the highest-ranked Applicants to proceed with initial negotiations with the [Connecticut Utilities]," who "also initiated the . . . negotiation process with Applicants." (Commissioner's Determination at 3.) On September 18, 2013, "the Commissioner formally directed the [Connecticut Utilities] to enter into contracts with two projects that had successfully completed negotiations for [power purchase agreements] with the [Connecticut Utilities]" and final agreements were signed and executed the following day. (*Id.*)

Allco counters that "by requiring the Connecticut Utilities to purchase power at a fixed price from the State's favored generator, pursuant to criteria developed by the State," the utilities were prevented "from freely negotiating for a different contractual price."  (Pl.'s Opp'n at 20.)   It notes that in proceedings before the Public Utilities Regulatory Authority, the United Illuminating Company ("UI") confirmed that it "did not perform an independent cost-benefit analysis for the proposed contracts," because Section 6 "provides the basis for UI entering into the two contracts" and "specifically charged the Authority, and not the [Connecticut Utilities], with performing the analysis of customer costs and benefits, and determining which projects to direct the [Connecticut Utilities] to contract with." (UR-022, Ex. E to Am. Compl.; *see also* Am. Compl. ¶ 55.)  It thus contends that Defendant's argument that the bidders set the price "ignores the very act at issue in this case—that it was only through the Defendant's Order that the wholesale price was, in fact, fixed," which amounts to an impermissible state encroachment upon FERC's authority.  (Pl.'s Opp'n at 2.)

Plaintiff offers no authority in support of this conclusion, and contrary to Allco's argument, the mechanism by which the final price of the contracts was "fixed" is in fact dispositive.  Absent any non-conclusory allegations that Defendant in fact "fixed" the contract prices, Section 6 is consistent with the "broad powers" of the states "to direct the planning and resource decisions of utilities under their jurisdiction."  *Entergy Nuclear Vermont Yankee, LLC*, 733 F.3d at 417.  While these state efforts may have some "indirect effect" on wholesale rates, not all such state action is preempted because "'there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market.'"  *Nazarian*, 753 F.3d at 478 (quoting *Nw. Cent.*

*Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 514 (1989)); *see also Connecticut Dep't of Pub. Util. Control v. F.E.R.C.*, 569 F.3d 477, 481 (D.C. Cir. 2009) (noting that indirect effect on energy markets is a "natural" consequence of state regulation).

Section 6 stands in contrast to state efforts that have been held to be preempted, such as in *Nazarian* where Maryland attempted to incentivize the construction of a new power plant by offering a fixed, twenty-year revenue stream secured by "contracts for differences," which required the state's utility companies to make payments "amounting to the difference between [the plant operator's] revenue requirements per unit of energy and capacity sold (set forth in its winning bid) and its actual sales receipts." 753 F.3d at 473–74. The Fourth Circuit held that the program was "field preempted because it functionally sets the rate that [the plant operator] receives for its sales" and "the contract price guaranteed by the [program] supersedes the . . . rates that [the plant operator] would otherwise earn—rates established through a FERC-approved market mechanism. . . . regardless of the market price." *Id.* at 476–77. Thus, the state "imping[ed] on FERC's exclusive power to specify wholesale rates." *Id.* at 477.

The Fourth Circuit emphasized "the limited scope" of its holding, confined to "the specific program at issue" and did "not express an opinion on other state efforts to encourage new generation, such as direct subsidies or tax rebates, that may or may not differ in important ways from the Maryland initiative." *Id.* at 478. The Maryland program failed, however, because its "effect . . . on matters within FERC's exclusive jurisdiction is neither indirect nor incidental," but rather "strikes at the heart of the agency's statutory power to establish rates for the sale of electric energy in interstate

commerce by adopting terms and prices set by Maryland, not those sanctioned by FERC." *Id.* (internal citation omitted).  Likewise in *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 253–54 (3d Cir. 2014), a similar New Jersey law was invalidated on preemption grounds because it "essentially set[] a price for wholesale energy sales" and was not within the state's power to regulate utilities even when doing so "would indirectly affect interstate rates."[8]

Notably, Section 6 is devoid of any such market-distorting features that encroach FERC's exclusive jurisdiction over setting wholesale rates.  Defendant plays no role in determining the price offered by bidders.   Although the Connecticut Utilities are compelled to accept the prices in the bidders' offers, which are selected by Defendant, there is no market distortion and to the extent that Section 6 has an indirect effect on the market, it is incidental and within the State's authority to regulate utilities under its jurisdiction.  Accordingly, Defendant's motion to dismiss is granted as to Count One.

### D.    Section 1983 Claim

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof

---

[8] FERC argued that the New Jersey law was preempted because it undermined FERC's effort to "ensure that subsidized entry supported at the state level does not have the effect of disrupting the competitive price signals that . . . wholesale capacity market protocols are designed to produce."  Br. for DOJ and FERC at 16, *PPL EnergyPlus, LLC v. Solomon*, No. 13-4330 (3d Cir. Mar. 20, 2014) (quoting *PJM Interconnection, L.L.C.*, 143 FERC ⸹ 61,090 at P54 (2013)).  FERC acknowledged that states "have numerous ways to incentivize construction of new generation facilities that do not directly affect the setting of FERC-jurisdictional wholesale rates" even if they "result in indirect effects on a capacity market."  *Id.* at 18–20.

to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."   Allco contends that "Defendant impermissibly discriminated against" its projects and in doing so violated its rights, which are "derived from the FPA and PURPA" and that by violating these acts, "Defendant has injured Plaintiff" and it "has suffered harm and damages."  (Pl.'s Opp'n at 24.)

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal citations omitted).  Thus, a 1983 action can be based only on a constitutional claim or a claim of a violation of a federal right.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) ("In order to seek redress through section 1983, . . . a plaintiff must assert the violation of a federal right, not merely a violation of a federal law.").  "The first step in any such claim is to identify the specific . . . right allegedly infringed."  *Albright*, 510 U.S. at 271.  Plaintiff cites no authority for the proposition that even if Section 6, as implemented, were found to be preempted by the FPA, that a disappointed bidder could maintain an action against state officials under § 1983.  As the FPA does not create any individual federal rights that can be enforced under § 1983, Defendant's motion to dismiss Count Two is granted.

III.    **Conclusion**

Because Allco has not suffered a legally protected injury within the zone of interests protected by the Federal Power Act nor shown that it is likely that any such injury would be redressed by a favorable decision by the Court, it lacks standing in this case.  Plaintiff's claim also fails on the merits, because Defendant's implementation of Section 6 does not seek to regulate wholesale energy sales but rather is a permissible regulation of utilities under the State's jurisdiction.  Therefore, Defendant's Motion [Doc. # 31] to dismiss is GRANTED.  The Clerk is directed to close this case.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 10th day of December, 2014.